<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| MARK C. SAMPSON | : | |
| | : | |
| Plaintiff, | : | Civ. No. 09-4372(DRD) |
| | : | |
| v. | : | **O P I N I O N** |
| | : | |
| MICHAEL J. ASTRUE, | : | |
| Commissioner of Social Security, | : | |
| | : | |
| Defendant. | : | |

Carol Matula, Esq.
Central Jersey Legal Services, Inc.
317 George St., Suite 201
New Brunswick, NJ  08901-2006
       Attorney for Plaintiff

Paul J. Fishman
United States Attorney
By:    Karen T. Callahan
       Special Assistant U.S. Attorney
       c/o Social Security Administration
       26 Federal Plaza, Room 3904
       New York, New York  10278----3
       Attorney for Defendant.

**Debevoise, Senior United States District Judge**

       Plaintiff, Mark C. Sampson, filed a complaint challenging the Appeals Council's denial

of his request for review of the Administrative Law Judge's ("ALJ") decision that his disability

under sections 216(i) and 223(f) of the Social Security Act ended as of January 1, 2006 because

his medical condition had improved, he was capable of sedentary work, and there were jobs in

the national economy that he could perform.

**<u>Procedural Background</u>**

Plaintiff, was awarded SSDI benefits in 2003 based on a diagnosis of acute lymphatic leukemia ("ALL").  After a 2005 review of Plaintiff's medical condition, the Social Security Administration ("SSA") determined that Plaintiff's medical condition improved as of January 1, 2006.  After timely filing a Request for Reconsideration, Plaintiff had a hearing before a New Jersey disability examiner.  The examiner affirmed the SSA's decision.  Plaintiff timely filed a Request for a Hearing, and after a June 25, 2008 hearing, the ALJ found that Plaintiff's medical condition improved, that he was capable of sedentary work and that there was work in the national economy that he could perform.  On July 9, 2009 the Appeals Council denied Plaintiff's request for review, and the complaint was filed on September 8, 2009.

**<u>The Facts</u>**

**Plaintiff's Background**

Plaintiff was born on February 6, 1960. (R. 236).  He was 48 at the time of the hearing. He had one year of college and served six years in the Marines.  (R. 510:25-511:5).  Plaintiff then held various jobs such as a bouncer, bounty hunter and automobile salesman.  (R. 512:5-6). His last reported earnings were in 2002.  (R. 49).

**Medical History Reports**

In 1993, Plaintiff was in a car accident.  (R. 232).  As a result of this accident, a plate with screws was placed in his left hip.  In addition, due to a problem with a traction device while he was in the hospital, two screws were left in his lower leg.  (R. 489; 514:5-18).

In 2002, Plaintiff was stabbed in the abdomen and hospitalized for seven days.  (R. 190). He developed a hernia as a result of this stabbing.  (R. 515:23-516:5).

2

In June 2002, Plaintiff was diagnosed with diabetes.  He was prescribed glyburide, which he was taking at the time of the hearing.  (R. 182: 142).

**Shands Jacksonville – Treatment for ALL**

In March 2003, Plaintiff was admitted to Shands Jacksonville, where he was diagnosed with ALL and hepatitis C.  (R. 168).  He had no complaints of neuropathy at that time.  (R. 171).  For two years, his leukemia was treated with, among other drugs, vincristine, Cytoxan and neupogen.  (R. 169, 203, 246).

By July 2005, Plaintiff's leukemia was in remission.  He developed sensory neuropathy in his feet, which Dr. Pham, his treating physician, rated as moderate to severe.  (R. 201, 203).  He also had an episode of edema in his legs, which was evaluated by Dr. Dennis, M.D. (R. 208).  In November 2005, Dr. Pham rated his neuropathy as severe.  (R. 239)  By March 2006, the neuropathy progressed to his hands.  (R. 236).  In spite of this, Plaintiff stated that he was thinking about going back to work.  (Id.)  Among other medications, Dr. Pham prescribed morphine and methadone for his neuropathy.  (R. 203, 236, 237, 238).  Dr. Pham was unsure of the cause of the neuropathy and tentatively identified it as diabetic neuropathy.  ("The neuropathy (sensory) . . . I think, is due to diabetes mellitus.")  (R. 201).

**Dr. Takach – Non-Examining Medical Consultant**

Dr. Takach, M.D., completed an RFC Questionnaire on December 20, 2005, noting that there was a source statement regarding Plaintiff's physical capabilities in the file, although there was no RFC in the file.  (R. 223-30, esp. 229, 230).  The only source statement in the record relating to Plaintiff's capabilities was a single page in which Dr. Pham described the sensory neuropathy as causing pain and numbness in Plaintiff's feet, but Plaintiff's gait was "OK."  (R. 201).  Dr. Takach did not dispute that Plaintiff had sensory neuropathy.  (R. 224, 228).  He

completed an RFC Questionnaire which stated that Plaintiff could sit six hours per day and stand or walk three hours per day.  (R. 224).  He opined that Plaintiff should never climb a ladder, rope or scaffold and that he should not be exposed to temperature extremes.  (R. 225, 227).

**Dr. Brigety – Non-Examining Medical Consultant**

On July 3, 2006, Dr. Brigety, M.D., completed an advisory RFC Questionnaire, noting, in contrast to Dr. Takach's statement, that there was no statement in the file regarding Plaintiff's physical capacities.  (R. 363-70, esp. 369).  He questioned whether the neuropathy was due to chemotherapy rather than diabetes and found the complaints of pain credible.  (R. 365, 368).  He opined that Plaintiff could sit about 6 hours in a workday and stand or walk four hours in a workday.  (R. 364).  He opined that Plaintiff could "occasionally" climb a ladder, rope and scaffold, as well as crouch or crawl, but did not see the need for any environmental limitations.

**Dr. Brown – State Psychological Examiner**

On January 5, 2006, James Brown, Ph.D., interviewed Plaintiff.  He reported that Plaintiff said he experienced sleep variability and that he isolated himself from friends and family.  (R. 231, 234).  He reported that Plaintiff was able to dress, bathe, groom himself, cook and prepare food, do general cleaning, laundry, shopping, manage money and drive.  (R. 234). Dr. Brown noted that Plaintiff's mood was depressed and he appeared sad.  (R. 233).  He observed a shuffling gait.  (R. 232).  He concluded that Plaintiff's prognosis was fair.  He recommended that Plaintiff obtain treatment to "help deal with the challenges and realities of his situation."  (R. 234).

Dr. Brown completed an RFC Questionnaire on January 25, 2006 concluding that Plaintiff did not meet a listing for an affective disorder.  (R. 293-305).

**Dr. Patel – Treating Internist**

By September 2006, Plaintiff had moved to New Jersey and saw Dr. Patel, M.D.  Plaintiff complained of generalized body ache, feet pain, numbness and burning in both his feet.  (R. 383).  Dr. Patel noted mild decreased sensations as well as redness and inflammation on the feet. (Id.)

**Dr. Fishkin – Treating Oncologist**

Dr. Fishkin, M.D., examined Plaintiff on November 22, 2006 to monitor the Ommaya reservoir and port-a-catch through which the chemotherapy had been administered.  (R. 244). He found that "vibratory sensation is intact."  (R. 390).

**Dr. Freeman – Treating Pain Specialist**

Dr. Freeman, D.O., treated Plaintiff fourteen times from September 2006 through March 18, 2008.  (R. 438-70).  Dr. Freeman attributed the neuropathy to the effects of chemotherapy. (R. 467).

At virtually every visit, Plaintiff complained of pain, numbness, burning and/or tingling:

> 9/11/06: "Symptoms are exacerbated with lying down and constant with no significant relief."  "Significant neuropathy." Pain described as constant 7 out of 10 points, "sharp stabbing in nature with dull aching episodes as well . . . shooting pain, pins and needles, numbness, tingling, aching, cramping and spasm."  (R. 468).
>
> 9/25/06: "Overall symptoms are unchanged." (R. 467).
>
> 10/30/06: "Overall his symptoms are unchanged."  (R. 466).
>
> 11/29/06:  Complained that methadone was not providing any benefit.  Lyrica[1] helped his symptoms and was increased.  (R. 461).
>
> 12/13/06: "[D]id not tolerate Kadian.[2]  Stated it did not provide him any significant benefit.  He continues to have

---

[1] Lyrica is a non-opioid drug approved for diabetic peripheral neuropathy.  PHYSICIANS' DESK REFERENCE 2527, 2531 (63rd edition 2009).

pain which is in low back radiating down the bilateral lower extremity." Switched from Kadian to MS Contin.[3] (R. 460).

12/27/06:  Notes there is still burning pain.  Lyrica stopped in the past.  MS Contin prescribed at 60mg 3x/day.  (R. 459).

2/5/07:  Some burning, pins, needles and numbness.  MS Contin dosage increased to 200mg/12 hr.  (R. 458, 459).

3/12/07:  Less numbness and tingling.  (R. 457).

5/10/07:  "[C]ontinues to have pain radiating down the bilateral lower extremity."  Aching pain.  MS Contin dosage 100mg 2x/day.  (R. 456).

6/7/07:  "Overall symptoms unchanged.""  [C]ontinues to have leg pain with associate [sic] numbness and tingling." (R. 448).

8/16/07:  "Continues to have pain in the joint, hands as well as bilateral lower extremity."  Pains in the left abdominal region; "sharp, shooting at times."  (R. 447).

11/5/07:  New problem of low back pain, sharp, stabbing, shooting with radiation down the lower extremity.  (R. 446).

12/17/07:  "He continues to have required medication management for his neuropathy."  Pain is in lower back region and radiates down the lateral lower extremity.  (R. 442).

3/18/08:  Pain in low back radiates distally.  (R. 439).

Dr. Freeman tried various medications to help control the neuropathy, such as Kadian and Lyrica, but ultimately, Plaintiff remained on morphine.  (R. 460, 461).

On August 16, 2006, Plaintiff had a titer of 40 for rheumatoid arthritis and a titer of 2 on May 18, 2007.  (R. 398, 408).

---

[2] Kadian is an extended release form of morphine sulfate.  See http://www.kadian.com/pages/default.aspx.
[3] MS Contin is a time-released form of morphine sulfate.  PHYSICIANS' DESK REFERENCE 2585 (63rd edition 2009).

By November 2007, he developed low back pain, described as a sharp shooting pain.  An MRI revealed lumbar disc herniation at L4-L5 and disc bulging at L5-S1.  (R. 445).  By March 25, 2008, he had two epidural steroid injections, which relieved his pain by about 50%.  (R. 439-42).  On March 18, 2008, Dr. Freeman wanted to schedule a third injection in three months.  (R. 439).

Dr. Freeman completed an RFC Questionnaire which opined that Plaintiff could only sit for 2 hours per eight hour day and that he could only sit for 20 minutes before having to stand.  Plaintiff would then have to stand for 45 minutes before he would have to sit.  (R. 477[4]).  He would need to take 6-7 unscheduled breaks during a workday and rest for 20 minutes before returning to work.  (R. 431).  Breaks would be needed because of muscle weakness, pain, paresthesia and numbness and the adverse effects of his medication.  (R. 431).  He has impaired sleep and his medication causes drowsiness and sedation. (R. 429, 430).

**Dr. Perdomo – Examining Psychologist**

Dr. Perdomo, Ph.D., examined Plaintiff on April 24, 2008.  (R. 471-475).  He reported that Plaintiff said that he feels tired all the time.  Dr. Perdomo concluded that Plaintiff's pain may completely affect his ability to function at a job.  Like Dr. Brown, he suggested that Plaintiff seek psychiatric treatment for his depression.  (R. 474).

**Plaintiff's Written Statements**

Pro se, in August 2005, Plaintiff wrote in SSA form SSA-454 BK that his legs swelled.  His feet and legs hurt so that he couldn't do much.  While he wanted to work, he said he would miss work because of the pain, as his medicines didn't always work.  (R. 132-37).  Prior to Dr. Brown's evaluation in January 2006, Plaintiff wrote on SSA form SSA-3373-BK that his bones hurt, his body aches and he had tingling sensations in his toes, shooting pains in his legs.  A

---

[4] This corrects page 430.  (R. 503:1-20).

friend helped him clean because he got tired.  He didn't sleep well because he woke up due to the discomfort.  He forgot to take medicines and was forgetful.  He only cooked small meals and used microwave.  He stayed to himself.  He did not do a lot of shopping.  (R. 117-24).

**State Disability Hearing**

On July 24, 2007, Plaintiff testified before the state disability hearing officer.  (R. 550).  The examiner noted Plaintiff Sampson's testimony as follows:  He has pain from arthritis in his fingers, knees and all joints and pain from a hernia that he has been unable to get fixed.  (R. 561, 567).  He has constant pain in his legs and chemotherapy-induced neuropathy resulting in "dead spots" and tingling in his feet and fingers.  (R. 561, 563, 567).  He drops things and has to grip his fork tightly.  (R. 561).  He is very forgetful.  (R. 565).

He takes morphine, but it merely "takes the edge off."  He is depressed.  His sleep is irregular.  (R. 562).  He can only walk one block before feeling pain and having to stop and rest for 5-10 minutes.  (R. 565).  He can sit for about 15 minutes before his feet will hurt and swell.  (Id.)  He can drive.  (R. 564).  He shops because there is no one else to do this and can carry one or two bags of groceries.  (R. 564, 565).  He does not go upstairs in his apartment because his legs hurt.  (R. 563).  He prepares "quick things" for meals and cleans the kitchen and bathroom.  The rest of the apartment is a "mess," but he doesn't care, because he doesn't have company.  (R. 563).  The hearing officer observed that Plaintiff was uncomfortable during the hearing and that he stood by the end of the hearing.  He walked slowly.  (R. 567).  The examiner found that Plaintiff's condition medically improved.  While he accepted that Plaintiff had pain from diabetes and chemotherapy, he did not find any disorganization of motor functions.  He found that Plaintiff could shop, drive and maintain his apartment.  (R. 554).  In his conclusion, the hearing officer found Plaintiff's credibility questionable, by reason of the fact that Plaintiff could

have moved from the apartment based on its cost, although Plaintiff did not testify about its cost, and because Plaintiff testified that he had not been with a woman, although he took medication for erectile dysfunction.  (R. 554).

**Administrative Hearing – Plaintiff's Testimony**

Before the ALJ, Plaintiff testified as to the pain, numbness, tingling and burning he feels in his feet, hips, back, legs and hands.  (R. 515:6 – 524:25).  He feels shooting pain up and down his leg and pain in his hip from his 1993 accident.  (R. 514:5 – 515:17).  He got a hernia from a stabbing in 2002, and his pain has increased since that time.  He also gets nauseous.  (R. 515:22 – 516:9; 526:22).  As a result of his treatment for ALL, he developed neuropathy in his hands and feet.  No drugs, including methadone and morphine, are successful in controlling his pain. (R. 517:3-25).  His feet and toes feel numb and constantly burning.  They feel like electricity is buzzing through them.  His ankles swell.  (R. 518:5-25).  His hand and arms similarly experience constant "buzzing."  (R. 519:4:10).

If he does not take his 200 mg/day morphine, he experiences withdrawal symptoms, including a runny nose and cramps.  (R. 518, 519:20 – 520:4).  The morphine makes him "foggy" and unable to remember things.  (R. 513:14-22).  It also makes him sleepy and he needs to take naps.  (R. 520:5-13).

He has cramps at night which prevent him from sleeping.  (R. 520:14-521:4)  He has stiffness in his knees fingertips and elbows from arthritis.  (R. 523:5-10).  He has constant aching and shooting pain in his lower back and left hip from a herniated disc in his back.  (R. 523:23-524:25).  Although he had three steroid injections, they only helped for about a day.  (R. 526:24-527:11).  He can't afford the co-pay for physical therapy or a hernia operation.  (R. 521:15-20;

525:5-18).  He does not get therapy for his depression because he cannot afford it and he is overwhelmed by his other problems.  (R. 525:4-23).

He primarily lies around all day on his recliner, because he is more comfortable with his feet up.  He can only sit for about 5-10 minutes and then he needs to stand, which he can also do only for about 10 minutes.  (R. 527:19-528:10).

In his job as a courier in January 2008, Plaintiff testified that he would pick up packages and drive them to other places for four days a week, not always for eight hours a day.  He testified that this aggravated his back.  In March 2008, he then tried to sell the Star-Ledger, sitting and standing at will in front of a supermarket for about five hours per day.  He tried this job for three weeks, but he was too uncomfortable to continue to work.  (R. 529:20-532:2).

**Dr. Fechner's Testimony – Internist, SSA's Non-Treating Medical Expert**

Dr. Fechner testified at the hearing there was no EMG or other objective test demonstrating neuropathy.  (R. 535:5-6, 537:13-14).  He testified that this was a case of sensory, as opposed to motor neuropathy, and that this would not affect motor functions other than pain he might have.  (R. 535: 1-12).  He acknowledged that Plaintiff had sensory peripheral neuropathy and that his chemotherapeutic treatment could have caused it.  (R. 541:8-11; 535:1-3).  He testified that Plaintiff was on "big time pain medication" and that Plaintiff was "evidently in lots of pain."  (R. 535:20-21).  He opined that Plaintiff was limited to sedentary activity and could sit for six hours per day and stand or walk for two.  (R. 536: 8-19).

**Pat Green's Testimony – SSA's Vocational Expert**

Pat Green testified that Plaintiff could not return to his previous light work, but that there were three sedentary jobs in the national economy that he could perform.  (R. 544:11-546:20).  She testified that there would be no jobs in the national economy if someone with Plaintiff's

RFC were on strong medication, had an irregular sleep pattern and could only focus for 1/3 of the workday.  (R. 546:21-547:4).  She also testified that there would be no jobs in the national economy if someone with Plaintiff's RFC needed to get up every fifteen minutes to stand for a few minutes.  (R. 547:8-25).

### The ALJ's Opinion

The ALJ's Opinion contained a detailed account of Plaintiff's history and the medical record.  The opinion contained the following findings of fact and conclusions of law:

> 1.  The most recent favorable medical decision finding that the claimant was disabled is the determination dated June 1, 2003.  This is known as the "comparison point decision" or CPD.
>
> 2.  At the time of the CPD, the claimant had the following medically determinable impairment: leukemia.  This impairment was found to meet section(s) 13.06A of 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d)).
>
> 3.  Through January 1, 2006, the date the claimant's disability ended, the claimant did not engage in substantial gainful activity (20 CFR 404.1594(f)(1)).
>
> The claimant testified the he worked briefly in January 2008 and March 2008, but reportedly stopped due to his condition.  I find that the claimant's work in 2008 represents unsuccessful work attempts.
>
> 4.  The medical evidence establishes that, as of January 1, 2006, the claimant had the following medically determinable impairments: a history of leukemia, in remission; back disorder; and diabetes with neuropathy.  His depression is a "non-severe" impairment.
>
> The claimant's impairments have more than a minimal effect on his ability to perform basic work activities such as lifting and carrying and are therefore "severe."
>
> The claimant alleges depression, but Dr. Brown's report notes that the claimant lives alone and performs the activities of daily living, such as cooking, shopping, driving

and managing money.  The claimant was diagnosed with depressive disorder, NOS; however, on examination, his memory, concentration, and attention were intact.  Dr. Brown indicated that the claimant could function in a work setting (Exhibit 6F).  Dr. Perdomo's report notes that the claimant has never seen a psychiatrist and has never been on psychotropic medication.  Dr. Perdomo diagnosed recurrent major depression, but noted that the claimant's main problems were medical and gave him a GAF of 70 (Exhibit 19F).  Based on Dr. Brown's and Dr. Perdomo's reports and the claimant's ability to live independently, I concur with DDS (Exhibits 8F and 10F) and find that the claimant's depression is a "non-severe" impairment.

5.  Since January 1, 2006, the claimant did not have an impairment or combination of impairments which met or medically equaled the severity of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525 and 404.1526).

The claimant's leukemia is in remission and therefore no longer meets or equals Listing 13.06A.

The claimant has back pain with radiculopathy.  A report of an MRI dated November 19, 2007, of the claimant's lumbar spine revealed L4-5 disc herniation with some thecal sac impingement and mild compromise of the right lateral recess (Exhibit 18 F) and Dr. Freeman's reports note lumbar tenderness and spasm, limited motion of the lumbar spine, and positive straight leg raising bilaterally. However, on March 18, 2008, Dr. Freeman noted that the claimant had significant relief status-post epidural injections (Exhibit 18F).  The record does not document a disorder of the spine with evidence of nerve root compression, characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, atrophy, muscle weakness, sensory or reflex loss, and positive straight leg raising in the sitting and supine positions.  Therefore, I find that the claimant does not meet or equal Listing 1.04.

The claimant suffers from diabetes with neuropathy, but there is no evidence of significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements or gait and station (see 11.00C).  There is no evidence of acidosis or retinopathy.  Therefore, I find that

the claimant's diabetes with neuropathy does not meet or equal Listing 9.08.

6.  Medical improvement occurred as of January 1, 2006 (20 CFR 404.1594(b)(1)).

The medical evidence supports a finding that, as of January 1, 2006, there had been a decrease in medical severity of the impairment present at the time of the CPD because the claimant's leukemia was in remission.

7.  The medical improvement is related to the ability to work because, as of January 1, 2006, the claimant's CPD impairment(s) no longer met or medically equaled the same listing(s) that was met at the time of the CPD (20 CFR 404.1594(c)(3)(i)).

8.  As of January 1, 2006, the claimant continued to have a severe impairment or combination of impairments (20 CFR 404.1594(f)(6)).

9.  Based on the impairments present as of January 1, 2006, the claimant had the following residual functional capacity to perform sedentary work as defined in the Regulations (20 CFR 404.1567); however he is able to lift and carry only 10 pounds occasionally and 5 pounds frequently; furthermore, the claimant is limited to jobs that permit three breaks during the work day - - each of which is at least 15 minutes duration; that permit the claimant when seated during the work day to stand for 3-5 minutes at 45 minute intervals to stretch; that require occasional climbing of ladders, ropes, or scaffolds and only occasional climbing of a ramp or stairs; that require only occasional balancing, stooping, kneeling, crouching, and/or crawling; that require no occasional exposure to unprotected heights, hazards, or dangerous machinery; that do not involve exposure to temperature extremes; that are simple and unskilled, involving one or two steps; and that are low stress (that is, these jobs require only an occasional change in the work setting during the work day, and only an occasional change in decision making required during the work day).

After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could have reasonably been expected to produce the alleged symptoms; however, the claimant's

statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment for the reasons explained below.

[There followed a lengthy explanation of the Item 9 finding]

10.  As of January 1, 2006, the claimant was unable to perform past relevant work (20 CFR 404.1565).

The claimant has past relevant work as an insurance sales agent (DOT 250-257.010, skilled, light work); and auto salesperson (DOT 273-353.010, skilled, light work); and an auto sales and finance person (DOT 250-257.022, skilled, light work).  As per Ms. Green's testimony, based on his current residual functional capacity, the claimant cannot perform his past relevant work.  I credit her testimony and find that the claimant was unable to perform past relevant work as of January 1, 2006.

11.  Under the Regulations, on January 1, 2006, the claimant was considered a "younger individual" (within age range 45-49) (20 CFR 404.1563).

The claimant was born on February 6, 1960, and was 45 years old on January 1, 2006, which is considered a younger person under 20 CFT 404.1563.  The claimant is now 48 years old.

12.  The claimant has at least high school education and is able to communicate in English (20 CFR 404.1564).

13.  Beginning on January 1, 2006, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled,"  whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

14.  As of January 1, 2006, considering the claimant's age, education, work experience, and residual functional capacity based on the impairments present as of January 1, 2006, the claimant was able to perform a significant

14

number of jobs in the national economy (20 CFT 404.1560(c) and 404.1566).

Based on the testimony of the vocational expert, the undersigned concludes that as of January 1, 2006, the claimant was capable of making a successful adjustment to work that existed in significant numbers in the national economy. A finding if "not disabled" is therefore appropriate under the framework of the above-cited rule.

15. The claimant's disability ended as of January 1, 2006 (20 CFR 404.1 594(f)(8).

## Discussion

### A. Standard of Review

On appeal of a decision by the Commissioner of Social Security, a district court exercises plenary review of all legal issues in the case. Knepp v. Apfel, 204 F. 3d 78, 83 (3d Cir. 2000). A district court's review of the Commissioner's factual findings, however, is deferential and limited to determining whether the conclusions are supported by substantial evidence. 42 U.S.C. 405(g); Hartranft v. Apfel, 181 F. 3d 358, 360 (3d Cir. 1999) ("A district court will not set the Commissioner's decision aside if it is supported by substantial evidence, even if [the district court] would have decided the factual inquiry differently.") However, a district court need not blindly follow factual determinations that lack support in the record or are against the clear weight of the evidence adduced below. Substantial evidence consists of "more than a mere scintilla" of support for a determination. Richardson v. Perales, 402 U.S. 389, 401 (1971). Thus, the Commissioner's ruling will be affirmed only if it is supported by "such relevant evidence as a reasonable mind accepts as adequate to support a conclusion." Id.

The standard of review applicable to the Commissioner's decisions regarding the probative value of testimony is similarly deferential. An ALJ representing the Commissioner must consider all relevant evidence when determining whether an individual is disabled. See 20

C.F.R. 404.1527.  "That evidence includes medical records, observations made during formal medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others."  Fargnoli v. Massanari, 247 F. 3d 34, 41 (3d Cir. 2001). However, an ALJ may reject a claimant's testimony if he finds that it is not credible because it conflicts with objective medical evidence.  Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999).  Similarly, "when [expert] medical testimony of conclusions are conflicting, the ALJ is not only entitled but required to choose between them."  Cotter v. Harris, 642 F. 2d 700, 705 (3d Cir. 1981).  In doing so, an ALJ must engage in a "thorough discussion and analysis" of any conflicts between the various reports and testimony, and articulate his reasons for refusing to credit testimony by the claimant or medical experts.  Schaudeck, 181 F. 3d at 422 (internal quotations and citations omitted).

**B.  Determination of Disability**

Under the Social Security Act, Disability Insurance Benefits are provided to individuals who are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."  42 U.S.C. 423(d)(1)(A).  To constitute a disability, the impairment must be "expected to result in death" or "last for a continuous period of not less than 12 months," 42 U.S.C. 423(d)(1)(A), and be "of such severity that [the individual] is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work."  42 U.S.C. § 423(d)(2)(A).

After a claimant, such as Plaintiff, receives disability benefits, his entitlement to continued benefits may be reviewed periodically.  In order to discontinue benefits the Social Security Administration ("SSA") must show by substantial evidence that the claimant has

medically improved and is capable of engaging in substantial gainful activity ("SGA").  42

U.S.C. § 423 (f); 20 C.F.R. § 404.1594(a).

There is an eight step test to determine if a claimant remains entitled to disability

benefits.  20 C.F.R. § 404.1594(f).  The ALJ must determine if the claimant is engaging in SGA.

20 C.F.R. § 404.1594(f)(1).  If not, the ALJ must determine if the claimant meets or equals a

listing.  20 C.F.R. §404.1594(f)(2).  If not the ALJ must determine whether medical

improvement has occurred compared to the most recent favorable medical condition determining

that the claimant was disabled 20 C.F.R. § 404.1594(f)(3).  If medical improvement of the

disabling condition occurs, the ALJ must consider whether this is related to the ability to do

work.  20 C.F.R. § 404.1594(f)(4).  If the improvement is related to the ability to do work, then

the ALJ must consider whether all current impairments are severe.  20 C.F.R. § 404.1594(f)(6).

If they are severe, then the ALJ is to assess whether the claimant can engage in SGA, i.e.,

whether the claimant can return to his past work after determining the claimant's Residual

Functional Capacity ("RFC") based on all current impairments.  20 C.F.R. § 404.1594(f)(7).

Last, if the claimant cannot return to his past work, the ALJ is to assess whether the claimant can

perform other work given his RFC, age, education and experience.  § 404.1594(f)(8).  The ALJ

bears the burden of proof establishing that the claimant can engage in SGA before his or her

benefits are stopped.  42 U.S.C. § 423(f).

The ALJ went through the eight step procedure.  Plaintiff had been awarded benefits

based on a diagnosis of ALL.  Because his cancer was successfully treated, there was medical

improvement by 2006 which related to his ability to perform work.  Because his continuing

impairments were severe, the ALJ was required to determine Plaintiff's RFC and his ability to

perform past or other work.  Plaintiff challenges the ALJ's findings that Plaintiff's medical

condition improved as of January 1, 2006 and that he has ceased to be disabled within the meaning of the Social Security Act since that date.

## C.  Plaintiff's Contentions:

Plaintiff asserts a number of grounds for the relief he seeks:  1) reversal of the ALJ's decision and 2) direction that the Commissioner be directed to award benefits.  The discrete grounds are subsumed in the overarching contention that the decision as a whole is unsupported by substantial evidence.  Particularly, Plaintiff asserts 1) the ALJ failed properly to assess Plaintiff's complaints of pain in that she did not consider the factors required by 20 C.F.R. § 404.1529; her reliance on contradictory medical evidence was misplaced; and she did not consider the complications of chemotherapy; 2) the RFC adopted by the ALJ is unsupported by substantial evidence, and 3) the ALJ's decision that there were jobs that Plaintiff could perform is unsupported by substantial evidence.

1.  Pain:  Plaintiff testified extensively concerning his pain and the limitations it placed upon his activities.  The ALJ recognized that Plaintiff suffered a degree of pain, but found that he has residual functional capacity to perform sedentary work.  (R. 36).  In addition to considering subjective complaints of pain, once an ALJ determines that objective medical evidence supports a claimant's complaints of pain, "the complaints should then be given 'great weight' and may not be disregarded unless there exists contrary medical evidence."  Mason v. Shalala, 994 F. 2d 1058, 1067-68 (3d Cir. 1993).  Here, there was objective evidence of arthritis and disc herniation.  It is undisputed that Plaintiff suffered from neuropathy.

The ALJ evaluated Plaintiff's pain applying in general the criteria specified in 20 C.F.R. § 404.1529.  However, in doing so she appeared to give undue emphasis to factors contrary to Plaintiff's position and failed to give weight to factors that, under the regulations, are entitled to

greater weight, e.g., discounting or ignoring the evidence provided by long-term treating physicians and overemphasizing reports of one-time examiners.

For example, the ALJ relied on Dr. Brown's report that Plaintiff could drive, cook, shop, clean, prepare food and do laundry; she noted the examiner's decision that Plaintiff admitted that he could drive, shop, carry groceries and maintain an apartment.  Omitted was the evidence about the extent to which Plaintiff could carry on these activities.  He stated that he only did cooking, cleaning and laundry a little each day because he got tired.  (R. 119).  He did not do a lot of shopping.  (R. 120).  He sometimes needed to have a friend help him clean because he got tired.  (R. 118).  He testified that he prepared microwave or small meals.  (R. 119, 563).  Plaintiff testified before the state hearing officer that he cleans only his kitchen and bathroom and the rest of his apartment was "a mess".  (R. 25).  The ALJ failed to comment that Plaintiff told Dr. Perdomo his examining psychologist, that he did not drive long distances because of the pain. (R. 31).

Most extraordinarily, the ALJ noted that on two visits out of fourteen, Dr. Freeman, Plaintiff's treating physician, reported that Plaintiff was "sociable" and "could perform social and functional activities."  (R. 35).  Lacking is an explanation why the ALJ rejected the twelve other reports of visits to Dr. Freeman, particularly when Plaintiff was taking 400 mg/day of morphine for part of the time he was "sociable," in contrast to his usual amount of 200 mg/day. (R. 142, 456, 458).

Without explanation the ALJ ignored Plaintiff's statement to Dr. Brown (R. 28) and to Dr. Perdomo and the state disability officer (R. 25 and 28) that he isolates himself from most of his friends and family.

Plaintiff testified with regard to the location, duration, frequency and intensity of the pain in his legs, calf, back, hip and abdomen in addition to the tingling, pain and numbness in his hands, feet and toes.  This is all consistent with neuropathy, arthritis and disc herniation.

All of this was reported consistently during Plaintiff's fourteen visits to treating physician, Dr. Freeman.  The ALJ referred to only a few of Dr. Freeman's, notations, ignoring those which were replete with references to "no significant relief," "significant neuropathy," description of pain as constant 7 out of 10 points, "shooting pain, pins and needles, numbness, tingling, aching, cramping and spasm," "overall symptoms are unchanged" (see Dr. Freeman reports of 9/11/06, 9/25/06, 10/30/06, 11/29/06, 12/13/06, 12/27/06, 2/5/07, 8/16/07, and 12/17/07).

The ALJ limited her discussion of Dr. Freeman's reports to the comment that Dr. Freeman wrote on March 18, 2008 that Plaintiff had experienced significant relief from two epidurals (R. 439), failing to mention that the relief was waning such that Plaintiff needed a third epidural within three months.

While the ALJ noted that Plaintiff had been on strong medication, she failed to accord it weight in evaluating Plantiff's pain.  Plaintiff had been on a "big time pain medication," as Dr. Fechner put it (R. 535:21) since 2005, when Dr. Pham first prescribed it.  (R. 203, 240).  Nor did she mention that Dr. Fechner testified the Plaintiff is "evidently in lots of pain."  (R. 535:26). Plaintiff himself testified that no drug, including morphine, controls his pain, although the morphine limits the "electricity" and "buzzing" in his hands and feet (R. 517: 24-25; 519:1-9). Other medications were unsuccessful in managing pain.  Omitted from the ALJ's summary of Plaintiff's testimony was his statement that he was able to get some relief from pain by lying in a

recliner with his fee up and his back out and that he was uncomfortable sitting in chairs and could only sit in them for about 10 minutes.

The ALJ failed to take into account evidence regarding Plaintiff's physical limitations. She recited his testimony that he had problems walking, standing and sitting, including that he had trouble sitting for more than 5-10 minutes.  (R. 26).  He would have to get up and move after this time.  If he stood it could only be for about 10 minutes.  (R. 528:8-10).  The ALJ failed to note the disability hearing officer's corroborating observation that Plaintiff had difficulty sitting through the hearing and was standing by the end of the hearing.  The ALJ ignored other evidence of Plaintiff's physical limitations, although she recited seemingly positive signs.  For example she noted that during one 2005 visit of Plaintiff to his initial treating physician for his acute lymphocytic leukemia ("ALL"), Dr. Pham, Plaintiff stated that he was thinking of returning to work.  That was before Plaintiff's disabilities had fully manifested themselves and the ALJ failed to note that on the two occasions in 2008 when Plaintiff attempted to return to work the discomfort caused by his physical condition prevented him from continuing more than a few weeks.

There are but a few examples of the ALJ's reliance on seemingly positive findings of examiners or doctors without noting their irrelevance to Plaintiff's actual complaints or the other evidence demonstrating that these positive findings were contradicted by other compelling evidence.

There was a failure to take into account the complications of the chemotherapy that Plaintiff had undergone.  This was a factor in producing Plaintiff's neuropathy.  Agents such as vincristine, which was administered to Plaintiff, can cause sensory neuropathy by damaging sensory neurons, causing sensory loss, pain and parathesia.  (R. 246, 570-72, 591, 596).

There were different opinions in the record about the cause of the neuropathy.  Dr. Pham attributed it to Plaintiff's diabetes, although he was unsure of its origin (R. 201).  Dr. Brigety raised the question whether the neuropathy was caused by chemotherapy rather than diabetes (R. 365).  Dr. Freeman attributed the neuropathy to the side effects of chemotherapy (R. 466).  Dr. Fechner acknowledged on cross-examination that Plaintiff had sensory peripheral neuropathy and that chemotherapy medications with which plaintiff was treated could cause sensory peripheral neuropathy.  The ALJ focused only on the diagnosis of diabetes neuropathy, noting that Plaintiff's diabetes was well controlled.  (R. 33, 35).  She failed to consider the effects of chemotherapy.

The foregoing establishes that the ALJ failed to assess properly Plaintiff's complaints of pan and her finding that he was not credible was not supported by substantial evidence.

2. Plaintiff's RFC:  20 C.F.R. § 404.1567 sets forth some exertional and postural limitation for sedentary work.  SSR No. 83-10 defines sedentary work as the ability of a claimant to sit for six hours per day and stand or walk two hours per day.  The ALJ concluded that Plaintiff could perform sedentary work with certain postural limitations such as climbing ladders, ropes, scaffolding, kneeling and crouching, but with no exposure to temperature extremes.  There was no finding as to how long Plaintiff could sit, stand or walk, major considerations for sedentary work.  There was overwhelming evidence that Plaintiff's ability to sit stand and walk was extremely limited.  If it be assumed that the ALJ found implicitly that Plaintiff could sit for six hours a day and stand or walk for two hours a day, this finding would not be supported by substantial evidence.

As recited above, Plaintiff testified and reported about time limitations on his ability to sit, stand and walk.  His account was verified by Plaintiff's two treating physicians, Dr. Freeman

and Dr. Pham.  Dr. Freeman treated Plaintiff fourteen times over nineteen months.  Both these physicians recognized Plaintiff's need for major pain control and both prescribed morphine for it.

Treating physicians' reports should be given great weight, "especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time."  Brownswell v. Commissioner of Social Security, 554 F. 3d 352 (3d Cir. 2008) (internal citation omitted).

Dr. Freeman, a pain specialist, opined that Plaintiff could only sit for a total 2 hour per an 8 hour day and that he could only sit for 20 minutes before having to stand.  Plaintiff would then have to stand for 45 minutes before he would have to sit (R430, 477).  He would need to take 6-7 unscheduled breaks during a workday and rest for 20 minutes before returning to work.

The reports of non-treating physicians either were formulated before the medical record was complete (Dr. Takach and Dr. Brigety) or were inconsistent with each other (Dr. Takach and Dr. Brigety) or were authored by an internist rather than a pain specialist (Dr. Fechner) who was unaware that there was evidence of an arthritis titer.

The ALJ provided no good reason for relying on snippets from the non-treating physicians' reports and two unrepresentative statements within Dr. Freeman's reports rather than relying on the fourteen reports of Dr. Freeman which covered nineteen months of his treatment of Plaintiff.

The ALJ's finding that Plaintiff could engage in sedentary work is not supported by substantial evidence.

3. Jobs in the National Economy:  The ALJ called a vocational expert ("VE").  He asked the VE three hypothetical questions.  The first was:

> . . . assume an individual of the Claimant's age, educational background, and
> work history.  And assume that this person, this hypothetical person, is capable of

performing sedentary work.  However, he's limited to lifting five pounds frequently, ten pounds occasionally, limited to jobs that permit at least three breaks during the workday, each of at least 15 minutes duration, that permit this person, when seated during the workday, to stand for about three to five minutes at 45-minute intervals, that require only occasional use of ladders, ropes or scaffolds, and only occasional use of ramps or stars - - that are simple and unskilled, involving one or two steps, and that are low stress, that is require only an occasional change in decision making required during the workday.

Would there be any work that this hypothetical person could perform?

(R. 545-46).

In response to this hypothetical question the VE replied that the person could perform as a telephone solicitation clerk, could perform as an order clerk and as an addresser or stamper. (R. 546).  This answer does not support a finding that there were jobs in the national economy that Plaintiff could perform because the assumption that Plaintiff could perform sedentary work is not supported by substantial evidence, and even with the limitations on sedentary work that the ALJ incorporated into the hypothetical question, Plaintiff's ability to perform the work is not supported by substantial evidence.

The ALJ incorporated additional limitations into the hypothetical: ". . . the person, because of the strong medication that the person is taking, and also an irregular sleep pattern, that they're only able to focus for about one-third of the work day.  It's about two and a half hours during the eight-hour workday total.  Would that sort of a limitation in concentration, would – how would that affect, if at all, those jobs that you've described?"  The VE's answer was "[t]hey would be unable to perform those jobs."  (R. 546-47).

Finally, the ALJ asked, "what if the person required getting up and down much more frequently during the course of the workday than what the hypothetical required?  Let's assume that he had to get up maybe every 15 minutes and stand for a few minutes.  How would that

affect, if at all, those jobs that you've described? . . . Okay.  If they had to stand up and down more often, then they couldn't do any of those jobs that you've described?  The VE's answer; "Right." (R. 347).

The first hypothetical the answer to which found that there were jobs in the national economy that Plaintiff could perform relied upon a condition (ability to perform sedentary work) that was not supported by substantial evidence.  The second and third hypotheticals, the answers to which found that there were not jobs in the national economy that Plaintiff could perform, assumed the limitations that affected Plaintiff.

Consequently the ALJ's finding that there are jobs in the national economy that Plaintiff could perform at the critical date is not supported by substantial evidence.

## Conclusion

On the basis of the foregoing the ALJ's decision will be reversed.  The administrative record in this case has been fully developed and substantial evidence in the record as a whole indicates that Plaintiff was disabled and entitled to benefit.  Consequently on remand the Commissioner will be directed to award the benefits that were withheld from him.

*s / Dickinson R. Debevoise*
DICKINSON R. DEBEVOISE
U.S.S.D.J.

Dated:  March 28, 2011

25